UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
SOUTHERN DIVISION
AT PIKEVILLE

CIVIL ACTION NO. 20-19-DLB-EBA

LISA SPRADLIN                                                                                          PLAINTIFF

v.                          **MEMORANDUM OPINION AND ORDER**

JAMES PRIMM                                                                                           DEFENDANT

\*\*\* \*\*\* \*\*\* \*\*\*

I.  **INTRODUCTION**

This matter is before the Court on Defendant James Primm's Motion for Summary Judgment. (Doc. # 33). The Motion has been fully briefed and is ripe for review. (Docs. # 34 and 36). In her Complaint, Plaintiff Spradlin brings several claims against Defendant Primm in both his individual and official capacity. (Doc. # 1 ¶¶ 51-52). First, Spradlin alleges a 42 U.S.C. § 1983 excessive force claim under the Fourth and Fourteenth Amendments. (*Id.* ¶ 51). Second, Spradlin alleges Kentucky state law causes of action for assault, battery, and intentional infliction of emotional distress. (*Id.* ¶ 52). For the reasons set forth herein, Defendant's Motion for Summary Judgment is **GRANTED**.

II. **FACTUAL AND PROCEDURAL BACKGROUND**

On February 9, 2019, Plaintiff Lisa Spradlin got into an argument with her then-boyfriend Brian Palmer while the two were intoxicated.[1] (Doc. # 1 ¶ 7). Spradlin and

---

[1] This dispute revolves around events that were audio recorded, so this Court will primarily rely on that audio recording, its transcript, and the Complaint for the factual allegations in this matter. (Docs. # 1 and 1-1).

1

Palmer's argument escalated into a physical altercation which caused Palmer's exit to a neighbor's residence to call 911. (*Id.*); (*see also* Docs # 1-1 at 2-6 and 30 at 36).

Officer Primm had previously been dispatched to a domestic violence situation at Palmer's residence between Palmer and Spradlin. (Docs. # 30 at 50 and 32 at 11). On this night, Primm was dispatched to the scene, spoke with Palmer at the neighbor's house, then made his way to Palmer's residence to speak with Spradlin. (Doc. # 1 ¶ 11). Primm spoke to Spradlin about the incident, asking whether Palmer had kicked in a door that Spradlin showed him. (Docs. # 1 ¶ 13 and 1-1 at 9). Primm told Spradlin that Palmer did not want her to "go to jail and stuff," and that Palmer "just wants you out of here . . . ." (*Id.* at 10). Primm explained that he knew Spradlin did not reside at Palmer's home, to which Spradlin responded that Palmer had indeed "kicked [her] out." (*Id.*). Primm then asked Spradlin if the phone in her hand belonged to Palmer to which she responded affirmatively. (*Id.*). After Primm made several requests for Spradlin to hand over Palmer's phone with Spradlin refusing and asking for her own phone, a scuffle occurred between them. (*Id.* at 10-11); (*see also* Doc. # 1 ¶ 14). After the scuffle, Primm stated, "you're going to jail if you don't let me have that phone." (Docs. # 1 ¶ 16 and 1-1 at 11).

The altercation continued as Primm yelled at Spradlin to turn around, Spradlin asked about the location of her own cellphone, and Primm commanded Spradlin to release the phone in her possession to him. (Doc. # 1-1 at 11). At this point, Primm shoved Spradlin onto the bed in the bedroom and wrestled with her for the phone, while Spradlin yelled for Primm to "get off of" her and Primm then deployed his taser for the first time. (Docs. # 1 ¶ 17, 1-1 at 12, and 32 at 19). A few seconds later, Primm then deployed his taser again after telling Spradlin to turn over. (Doc. # 1-1 at 12). At some point during

2

this altercation, Officer Primm punched Spradlin in the face for grabbing his taser while he attempted to tase her a second time. (Docs. # 1 ¶ 20 and 1-1 at 13-15, 18). After deploying his taser the second time, Primm shouted repeatedly for Spradlin to "let go" and to "turn around." (Doc. # 1-1 at 12). Then, Spradlin argued with Primm stating that she had not done anything and that she was recording the incident. (*Id.*). Primm requested a backup unit. (*Id.*).

They continued to argue while Primm directed Spradlin into the living room to wait for an additional officer after they both agreed another officer would handcuff Spradlin. (Docs. # 1-1 at 13-14 and 32 at 33). Spradlin returned to the bedroom to use the adjacent bathroom while Primm told her to get back out. (Doc. # 1-1 at 16-17). Spradlin told Primm to get away from her to which Primm responded, "No, I'm not. I'm standing where I can see you, okay?" (*Id.* at 17). They proceeded to argue about the previous altercation on the bed and whether it was okay for Primm to punch Spradlin for grabbing his taser. (*Id.* at 18-20). Primm informed Spradlin that he tried to arrest her for not releasing Palmer's phone and for the alleged domestic violence. (*Id.* at 20-21).

At this point, Spradlin was unhandcuffed in the bathroom and began using the phone with both hands to take pictures of her face. (Docs. # 1 ¶¶ 36-38, 1-1 at 21, 32 at 40, and 30 at 109). Officer Primm instructed Spradlin not to take photos to which she responded, "no." (Docs. # 1 ¶ 38 and 1-1 at 21). Primm is then heard saying "uh-uh-uh," before tasing Spradlin again from about two feet away. (Doc. # 1 ¶¶ 38-39, 1-1 at 21, and 30 at 112). After tasing Spradlin, Primm told her that "it's going on again unless you put your hands up." (Doc. #1-1 at 21). Then, Primm handcuffed Spradlin and took her back into the living room to wait for additional law enforcement. (Doc. # 32 at 43).

3

Sometime after this incident, Spradlin realized that the cellphone in her possession at the time was in fact her own device and not Palmer's phone. (Doc. # 30 at 43). In state court, Spradlin was indicted for assault, domestic violence, theft by unlawful taking, resisting arrest, assault of a police officer, and attempted disarming of a police officer. (Doc. # 30 at 65-66). However, Spradlin was only convicted of resisting arrest, she was acquitted of the remaining charges. (Docs. # 1 ¶ 5 and 30 at 66).

### III. ANALYSIS

#### A. Standard of Review

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for summary judgment "bears the burden of showing the absence of any genuine issues of material fact." *Sigler v. American Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008) (citing *Plant v. Morton Int'l Inc.*, 212 F.3d 929, 934 (6th Cir. 2000)). In deciding a motion for summary judgment, the Court must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Following the Court's review of the record, if a "rational factfinder could not find for the nonmoving party, summary judgment is appropriate." *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 349 (6th Cir. 1998). Lastly, where an audio recording is present, the Court should view the facts in the light depicted by the recording. *Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015); *see Coble v. City of White House, Tenn.*, 634 F.3d 865, 868-69 (6th

4

Cir. 2011).

### B. 42 U.S.C. § 1983 Excessive Force Claim

42 U.S.C. § 1983 states that any "person who, under color of any statute . . . subjects . . . any citizen of the United States . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law." To make out a claim under § 1983, a plaintiff must show: "(1) that he or she was deprived of a right secured by the Constitution or laws of the United States; and (2) that the deprivation was caused by a person acting under color of law." *Robertson v. Lucas*, 753 F.3d 606, 614 (6th Cir. 2014).

Here, Spradlin asserts that her Fourth and Fourteenth Amendment rights were violated by Defendant Primm. (Doc. # 1 ¶ 51). The Sixth Circuit has long adhered to the view that the Fourth Amendment prohibits excessive force under certain pre-trial circumstances. *Hanson v. Madison Cnty. Det. Ctr.*, 736 F. App'x 521, 528 (6th Cir. 2018) (citing *McDowell v. Rogers*, 863 F.2d 1302, 1306 (6th Cir. 1988)). "Fourth Amendment protections extend through police booking until the completion of the probable cause hearing." *Coley v. Lucas Cnty., Ohio*, 799 F.3d 530, 537 (6th Cir. 2015). Fourteenth Amendment violations occur when the conduct of the law enforcement official shocks the conscience, the conduct is malicious and sadistic in the context of a fluid and dangerous situation, or the officer shows deliberate indifference when there was reasonable opportunity to deliberate before taking action. *Id.* (citations omitted). Here, the Fourth Amendment governs Spradlin's claim because she was being arrested at the time of the alleged excessive force, she had not even been booked at the time of the incident. *See id.*; (*see also* Doc. # 1); *Graham v. Connor*, 490 U.S. 386, 394-95 (1989) (noting that

5

where an excessive force claim arises in the context of an arrest, "it is most properly characterized as one invoking the protections of the Fourth Amendment."). However, Primm has raised the defense of qualified immunity and the Supreme Court has cautioned that "lower courts 'should think hard, and then think hard again,' before addressing both qualified immunity and the merits of an underlying constitutional claim." *Dist. Of Columbia. v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Camreta v. Greene*, 563 U.S. 692, 707 (2011)).

### 1. Official Capacity Claims

"A suit against an individual in his official capacity has been held to be essentially a suit directly against the local government unit and can result in that unit's liability to respond to the injured party for his injuries." *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1245 (6th Cir. 1989). However, a governmental entity cannot be held liable under a *respondeat superior* theory solely because it employs a tortfeasor. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). Liability attaches where the unconstitutional action "implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated" by municipal officers, or where the deprivation results from governmental "custom." *Hanson*, 736 F. App'x at 541 (quoting *Monell*, 436 U.S. at 690-91).

Throughout this matter, Spradlin has not alleged that Primm's actions were in any way related to a policy, ordinance, regulation, or decision of any municipal officers. She exclusively takes issue with Officer Primm's individual choices, such as punching and tasing her, while attempting to arrest her. (*See* Doc. # 1 ¶¶ 16-21, 26, 29, 39, 44). Accordingly, Primm's Motion for Summary Judgment with respect to Plaintiff's official

6

capacity claims is **granted**.

### 2. *Individual Capacity Claims*

Unlike official capacity claims, individual capacity claims seek to hold the official personally liable in a § 1983 action and no proof of government policy or custom is necessary. *Hafer v. Melo*, 502 U.S. 21, 25 (1991). However, qualified immunity still applies to these claims. *See id.*

#### a. **Qualified Immunity**

An official sued under § 1983 is entitled to qualified immunity unless it is shown that the official (1) violated a statutory or constitutional right and (2) that right was "clearly established" at the time of the challenged conduct. *Plumhoff v. Rickard*, 572 U.S. 765, 778 (2014) (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). And a "defendant cannot be said to have violated a clearly established right unless the right's contours were sufficiently definite that any reasonable official in the defendant's shoes would have understood that he was violating it." *Id*. (citing *al-Kidd*, 563 U.S. at 741). "While there does not have to be 'a case directly on point,' existing precedent must place the lawfulness of the particular arrest 'beyond debate.'" *Wesby*, 138 S. Ct. at 590 (quoting *al-Kidd*, 563 U.S. at 741). If "judges disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy." *Wilson v. Layne*, 526 U.S. 603, 618 (1999). "As a matter of public policy, qualified immunity provides ample protection to all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 335 (1986).

##### i. **Violation of a Constitutional Right**

The Fourth Amendment prohibits the use of excessive force by an arresting officer.

7

*Correa v. Simone*, 528 F. App'x 531, 533 (6th Cir. 2013) (citing *Graham*, 490 U.S. at 397). Fourth Amendment excessive force claims are analyzed under the objective reasonableness standard. *Graham*, 490 U.S. at 395. Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake. *Id*. at 396 (citations omitted). "Because the test of reasonableness is not capable of precise definition or mechanical application, . . . its proper application requires careful attention to the facts and circumstances of each particular case, including (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)).

Additionally, the reasonableness of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight. *Id.* (citing *Terry v. Ohio*, 392 U.S. 1, 20-22 (1968)). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id*. at 396-97.

First, the severity of the crime at issue weighs in Primm's favor. While Spradlin attempts to portray the crimes as "petty theft at worst and a domestic dispute which had been over almost an hour," that is a generous interpretation given Plaintiff's own audio recording. (Doc. # 34 at 9). At the time, Primm knew that Spradlin was trespassing on

8

Palmer's property as he wanted her removed, Spradlin and Palmer had been involved in a domestic violence altercation, and Spradlin claimed to have possession of Palmer's cellphone. (Doc. # 1-1 at 10, 21); *Correa*, 528 F. App'x at 534 (holding that crime was severe enough to weigh in favor of police use of taser where the police broadcast described an "assault by a man with a firearm.").

Second, Primm had responded to a previous domestic violence incident between Palmer and Spradlin. (Docs. # 30 at 50 and 32 at 11). Given the fact that Primm knew Spradlin had been violent in the past, it would be reasonable to conclude at the very least that she posed an immediate threat to his safety after seeing Palmer's injuries. (Doc. # 1 ¶¶ 8, 11). This factor is further analyzed below in the context of each application of Primm's taser and physical force.

The last factor asks this Court to consider whether the suspect was actively resisting arrest or evading arrest by flight. *Graham*, 490 U.S. at 396. Since this factor requires the same analysis as a clearly established right, it will also be grouped with the discussion below regarding Spradlin's active resistance.

### ii. Was the Right Clearly Established?

Generally, taser use has been found reasonable when the suspect was actively resisting and unreasonable where the suspect was not. *Thomas v. City of Eastpointe*, 715 F. App'x 458, 460 (6th Cir. 2017); *Goodwin v. City of Painesville*, 781 F.3d 314, 323 (6th Cir. 2015) ("Active resistance to an officer's command can legitimize an officer's use of a [t]aser."). For example, verbal hostility, deliberate acts of defiance, physically struggling with police, and refusing to be handcuffed are considered forms of active resistance. *Thomas*, 715 F. App'x at 460; *Goodwin*, 781 F.3d at 323; *Hagans v. Franklin*

9

*Cnty. Sheriff's Off.*, 695 F.3d 505, 509 (6th Cir. 2012). "There is no clearly established right for a suspect who 'actively resists' and refuses to be handcuffed to be free from [t]aser application." *Goodwin*, 781 F.3d at 323 (quoting *Hagans*, 695 F.3d at 509). Therefore, the relevant question is whether Spradlin was actively resisting Primm at each point in time the taser was applied to her. *See id.* (noting that "the material question, in light of multiple taser drives, is could a reasonable jury conclude that [the defendant] was not actively resisting officers' efforts to control him at that time?"); *Ortiz ex rel. Ortiz v. Kazimer*, 811 F.3d 848, 852 (6th Cir. 2016) (explaining that the gratuitous use of force against a suspect who has surrendered is excessive as a matter of law, even when the suspect initially resisted arrest). Since Primm's taser was used four times on Spradlin, this Court will consider Spradlin's active resistance or lack thereof leading up to each use, including Primm punching Spradlin. (Doc. # 1 ¶¶ 20-21, 25-26, 39, 42).

Beginning with the initial altercation in the bedroom, Primm pushed Spradlin onto the bed while arguing with her about the cellphone in her hand. (Doc. # 1 ¶ 17). At this point, Spradlin was actively resisting, as even the Complaint states, "Officer Primm then became physical with her by shoving her onto the bed in the bedroom and *wrestling* with her for the phone." (*Id.*). Spradlin and Primm can be heard on the audio recording arguing back and forth before the scuffle which led to the shove in the bedroom. (Doc. # 1-1 at 11-12). Undoubtedly, when Primm stated, "you're going to jail if you don't let me have that phone," Spradlin was on notice that she was being ordered to comply with a police command and that she was likely being apprehended. (*Id.* at 11); *see Goodwin*, 781 F.3d at 326 (noting that when a suspect flees and an officer pursues them, it is clear to the suspect that the officer intends to apprehend him). However, instead of complying with

10

that command, she repeatedly stated to Primm that she was "not doing nothing," and asked for her own phone. (Doc. # 1-1 at 11).

These acts constitute both deliberate acts of defiance and physically struggling with the police, two clear forms of active resistance. *Thomas*, 715 F. App'x at 460; *Goodwin*, 781 F.3d at 323; *see Eldridge v. City of Warren*, 533 F. App'x 529, 535 (6th Cir. 2013) (noting that non-compliance alone is not enough to indicate active resistance, there must be something more, such as a verbal showing of hostility or deliberate act of defiance using one's own body). Accordingly, Primm's first taser application to Spradlin on the bed did not constitute excessive force.

Likewise, Primm's second application of his taser to Spradlin on the bed did not constitute excessive force. (Doc. # 1-1 at 12). The first and second tasing are only a few seconds apart on the recording so little had changed, except Spradlin's statement after her initial tasing. After the first tasing, Primm tells Spradlin to turn over, she verbally refuses to do so, Primm repeats the command, and then tases her. (Docs. # 1-1 at 12 and 1 ¶ 26); *Rudlaff*, 791 F.3d at 642 (finding suspect was verbally defiant when they stated they were not going to comply); *Thomas*, 715 F. App'x at 460 (noting that active resistance constitutes refusing to be handcuffed). Since Spradlin was still defiant and physically struggling with Primm when he told her to turn over, the second tasing also did not constitute excessive force. *See Rudlaff*, 791 F.3d at 641 ("Our cases firmly establish that it is *not* excessive force for the police to tase someone (even multiple times) when the person is actively resisting arrest.").

Furthermore, Primm was justified in making the split-second decision to punch Spradlin when she had grabbed his taser during the altercation as that was a lower use

11

of force. (Docs. # 1-1 at 17 and 1 ¶¶ 25-26); *Kazimer*, 811 F.3d at 851 (noting that "the law does not lightly subject officers to liability after the fact for doing a dangerous job that often requires split-second judgments in complicated, quickly evolving criminal investigations.").

The next use of force is a closer call: Primm's third application of his taser to Spradlin when she was in the bathroom, but still justified in the Court's view. (Doc. # 1-1 at 21). Roughly ten minutes had passed in the recording between this tasing and the previous ones, Spradlin had become compliant, agreed for another officer to handcuff her, and walked to the living room. (*Id.* at 13-16). While Spradlin continued to argue with Primm, she was still complying with his command to remain in the living room. (*Id.*). However, Spradlin then became resistant to Primm's commands again a short while later after he agreed to let her use the bathroom. (*Id.* at 16). Primm asked if Spradlin was finished in the bathroom, and she responded that she was but that he should get away from her. (*Id.*). Primm then told Spradlin to come back out which Spradlin ignored, he repeated his command, Spradlin still told him to get away from her. (*Id.* at 17). They continued arguing while Primm was heard saying into his radio, "I got her in a bedroom, but she won't come out." (*Id.*). Spradlin then began to take a photograph of her face and Primm instructed her, "don't take a picture." (Docs. # 1 ¶ 38 and 1-1 at 21). Spradlin simply replied, "no." (Doc. # 1-1 at 21). Then, and this is disputed by the parties, Primm made a noise that is described as "uh-uh-uh" in Spradlin's own audio transcript before deploying his taser.[2] (*Id.*).

---

[2]   Plaintiff argues this noise was a "ha-ha-ha" laugh while Defendant argues this noise was a "uh-uh-uh" warning, but this fact is not material. *Compare* (Doc. # 34 at 1) *with* (Doc. # 36 at 1).

12

While Spradlin had become compliant for a short period of time, the record makes clear, and she admits, she was intoxicated and argumentative. (Docs. # 1 ¶¶ 7, 35 and 1-1 at 16-20). Before Spradlin was taking the photo, Primm had ordered her not to do so but Spradlin verbally and physically defied him by saying no and continuing to do so. *Thomas*, 715 F. App'x at 460; *Goodwin*, 781 F.3d at 323. Primm made a split-second decision to deploy his taser and did so after saying to Spradlin that he was going to stand where he could see her. (Doc. # 1-1 at 17). This shows that Primm was at least considering his own safety when he told Spradlin his intent to keep her within his view. Because of Spradlin's open defiance resulting in active resistance and Primm's concern of his possible inability to see Spradlin, this further use of force was not excessive.

Lastly, Primm tased Spradlin a final time shortly after the third time. (Doc. # 1-1 at 21). After Spradlin was tased the third time, she fell to the ground. (Doc. # 34 at 4). She told Primm not to tase her and said okay, to which Primm said, "I told ya." (Doc. # 1-1 at 21). Spradlin then again said "okay," and Primm replied, "don't do it," and that "it's going on again unless you put your hands up." (*Id.*). Spradlin again replied with an okay before the taser went off for the final time and Spradlin finally said, "okay, okay!" (*Id.*). Then, Primm handcuffed Spradlin, with no further use of force.

This use of force was not unreasonable. Even after a suspect is on the ground and arguably subdued, if they continue to be uncooperative and resist officers' attempts to secure their arms, then they can be tased. *See Caie v. West Bloomfield Twp.*, 485 F. App'x 92, 96-97 (6th Cir. 2012) (finding that tasing an intoxicated, uncooperative suspect was reasonable even if they were arguably subdued, despite the fact the suspect was not being arrested for a crime); *see also Williams v. Sandel*, 433 F. App'x 353, 362 (6th Cir.

2011) (holding that suspect being subject to baton strikes, pepper spray, and thirty-seven taser applications was not unreasonable if suspect was still unsecured and unwilling to comply).  Likewise, Spradlin was intoxicated, still unsecured, and non-compliant when Primm tased her the final time.  Notably, Primm did not tase Spradlin after she was handcuffed and secured.  See *Colbert v. City of Toledo*, No. 3:07 CV 493, 2010 WL 596460 (N.D. Ohio Feb. 16, 2010) (holding three taser shocks were reasonable because they were brief and only administered up until the person was handcuffed).

As none of Primm's uses of force were unreasonable, he is entitled to qualified immunity on Spradlin's claims.  Accordingly, Primm's Motion for Summary Judgment as to these claims is **granted**.

### C. State Law Claims

Spradlin brings claims under Kentucky state law for assault, battery, and intentional infliction of emotional distress.  (Doc. # 1 ¶ 52).  Again, Defendant Primm asserts qualified immunity but under state law.  (Doc. # 33-1 at 18).  Under Kentucky law, qualified immunity protects officers from liability for discretionary acts, taken in good faith, within their scope of authority.  *Williams*, 433 F. App'x at 363 (citing *Yanero v. Davis*, 65 S.W.3d 510, 522 (Ky. 2001).  Bad faith can be demonstrated by objective unreasonableness or by a subjective intent to harm.  *Id.* (citing *Yanero*, 65 S.W.3d at 523).  The plaintiff has the burden to prove that the officers' actions were not performed in good faith.  *Id*. (citing *James v. Wilson*, 95 S.W.3d 875, 905 (Ky. Ct. App. 2002)).

Spradlin's argument that Primm acted willfully and maliciously with intent to harm her is that (1) Primm punched her over a cellphone, (2) he tased her on the bed and in the bathroom, and (3) Primm laughed before tasing Spradlin in the bathroom.  (Doc. # 34

14

at 13). First, Spradlin's own audio transcript makes clear that Primm did not punch Spradlin solely over a cellphone, Primm punched Spradlin because she was resisting arrest and grabbed his taser. (Doc. # 1-1 at 18-19). Second, as discussed above, Primm's use of his taser was not unreasonable under the Fourth Amendment nor was he using his taser with a "corrupt motive." *See Rowan Cnty. v. Sloas*, 201 S.W.3d 469, 481 (Ky. 2006); *see also Hagans*, 695 F.3d at 511 (holding that state law claims for assault and battery were barred by immunity when a clearly established right had not been violated). Each time Primm deployed his taser, he instructed Spradlin to comply with an order, such as to give him the cellphone, to turn over, or to stop taking photos of her face. (Doc. # 1-1 at 10-12, 21). The only fact that arguably indicates malicious intent by Primm is Spradlin's assertion that he laughed before tasing her in the bathroom. (Docs. # 1-1 at 21 and 34 at 13). While that fact is in dispute about whether Primm laughed or warned Spradlin in that moment, this sole fact does not rise to meet Spradlin's burden of proof that Primm maliciously intended to hurt her. *See Williams*, 433 F. App'x at 364 (holding that one comment by an officer was not sufficient to defeat the presumption that the officer acted in good faith).

Even looking at the facts in the light most favorable to Spradlin, she has failed to meet her burden of proof to show Primm was acting in bad faith. Accordingly, Primm is entitled to immunity on Spradlin's state law claims and his Motion for Summary Judgment is **granted**.

### IV. CONCLUSION

Thus, for the reasons set forth herein, **IT IS HEREBY ORDERED** that:

(1) Defendant's Motion for Summary Judgment on (Doc. # 33) is **GRANTED**;

(2)   This civil action is **DISMISSED with prejudice** and **STRICKEN** from the Court's active docket; and

(3)   The Court will enter a corresponding Judgment with this Order.

This 25th day of January, 2022.



Signed By:
*David L. Bunning*   DB
United States District Judge

K:\DATA\ORDERS\PikeCivil\2020\20-19 Order Granting MSJ.docx